## IN THE SUPERIOR COURT OF THE STATE OF DELAWARE
## IN AND FOR NEW CASTLE COUNTY

| | | |
|---|---|---|
| NORTHPOINTE HOLDINGS, LLC, | ) | |
| Plaintiff/Counter-Defendant, | ) | |
| v. | ) | |
| NATIONWIDE EMERGING | ) | C.A. No. N09C-11-141 ALR |
| MANAGERS, LLC, | ) | |
| Defendant/Counter-Plaintiff/ | ) | |
| Third-Party Plaintiff, | ) | |
| and | ) | |
| NATIONWIDE CORPORATION, and | ) | |
| NATIONWIDE MUTUAL INSURANCE CO., | ) | |
| Defendants, | ) | |
| v. | ) | |
| NORTHPOINTE CAPITAL, LLC, | ) | |
| PETER CAHILL, MARY CHAMPAGNE, | ) | |
| ROBERT GLISE, MICHAEL HAYDEN, | ) | |
| JEFFREY PETHERICK, STEPHEN | ) | |
| ROBERTS, and CARL WILK, | ) | |
| Third-Party Defendants. | ) | |

Submitted: April 23, 2014
Decided: July 16, 2014

# DECISION AFTER TRIAL

Bartholomew J. Dalton, Esquire, Dalton & Associates, P.A., Wilmington, DE, and Rodger D. Young, Esquire, Jaye Quadrozzi, Esquire, Young & Associates, Farmington Hills, MI, Attorneys for NorthPointe Holdings, LLC, NorthPointe Capital, LLC, Peter Cahill, Mary Champagne, Robert Glise, Michael Hayden, Jeffrey Petherick, Stephen Roberts and Carl Wilk.

Colm F. Connolly, Esquire, Morgan, Lewis & Bockius LLP, Wilmington, DE, and Jay H. Calvert Jr., Esquire, Bahar Shariati, Esquire, Jessica A. Stow, Esquire, Morgan, Lewis & Bockius LLP, Philadelphia, PA, Attorneys for Nationwide Emerging Managers, LLC, Nationwide Corporation, and Nationwide Mutual Insurance Company.

**Rocanelli, J.**

## I. INTRODUCTION

NorthPointe Capital, LLC ("NP Capital") was created in 1999 to invest in publicly traded stocks and act as a mutual fund advisor to a variety of mutual funds. Nationwide Emerging Managers, LLC owned the majority interest in NP Capital, specifically sixty-five percent (65%). The remaining thirty-five percent (35%) of NP Capital was owned by four individuals who were the persons who managed the day-to-day operations of NP Capital.

Nationwide Emerging Managers is a Defendant, Counter-Plaintiff, and Third-Party Plaintiff. Nationwide Mutual Insurance Company and Nationwide Corporation are also Defendants. (Collectively, these Nationwide entities are referred to as "Nationwide.")

When NP Capital was created, it was consistent with Nationwide's investment strategy of direct management of assets. In or about 2006, Nationwide sought to divest its interest in NP Capital and offered the four NP Capital individuals the opportunity to purchase Nationwide's interests in a Management Buy-Out ("MBO"). The divestment from NP Capital was consistent with Nationwide's strategic shift to be divested of its direct asset management role.

In response to Nationwide's expressed interest to divest from NP Capital, the four individuals with an ownership interest in NP Capital created a new company,

1

NorthPointe Holdings, LLC, for the purpose of purchasing the shares in NP Capital. Three additional individuals were brought in as investors/owners.

NorthPointe Holdings, LLC is the Plaintiff and Counter-Defendant. The seven individuals with an ownership interest in NorthPointe Holdings, LLC are Third-Party Defendants. They are Peter Cahill, Mary Champagne, Robert Glise, Michael Hayden, Jeffrey Petherick, Stephen Roberts, and Carl Wilk. (NorthPointe Holdings, LLC and the seven individual parties are collectively referred to as "NorthPointe"). NP Capital is also a Third-Party Defendant.

By 2006, prior to the MBO, seven funds were managed by NP Capital; five of the funds were branded as Nationwide funds and two of the funds were branded as NorthPointe funds. The seven funds were:

1. Nationwide Large Cap Value Fund

2. Nationwide Value Opportunities Fund

3. Nationwide Mid Cap Growth Fund

4. Nationwide Micro Cap Equity

5. NorthPointe Small Cap Value Fund

6. NorthPointe Small Cap Growth Fund

7. Nationwide NVIT Mid Cap Growth Fund ("NorthPointe NVIT").

Of the seven funds under management prior to the MBO, six had approximately $100 million or less of assets under management ("AUM"). The seventh fund, NorthPointe NVIT, had over $400 million in AUM. NorthPointe NVIT was a variable annuity/variable life ("VA/VL") trust fund in which Nationwide, not direct individual investors, owned the AUM on behalf of individuals. The NorthPointe NVIT was an option on the VA/VL funds menu at Nationwide. The NorthPointe NVIT was a very important part of NP Capital's business model and was a key to NorthPointe's success as a company independent from Nationwide.

After Nationwide proposed the MBO of NP Capital in June 2006, the parties negotiated terms and conditions of the MBO. The Purchase Agreement was signed on July 19, 2007 and the Closing Date was September 28, 2007. The Purchase Agreement did not transfer ownership of the funds. Rather, it transferred advisory management of the funds from NP Capital, in which Nationwide had an ownership interest, to NorthPointe, which was independent of Nationwide.

## II. PROCEDURAL HISTORY

This lawsuit was filed by NorthPointe on November 17, 2009. Thereafter, a Second Amended Complaint was filed. In lieu of an answer, Nationwide moved to dismiss or, in the alternative, sought a more definitive statement. The Court issued

3

a memorandum opinion on September 14, 2010 upon Nationwide's motion to dismiss or for a more definite statement, which was granted in part and denied in part.

Nationwide filed a motion for summary judgment. On May 24, 2012, the Court denied Nationwide's motion for summary judgment and granted NorthPointe's motion to amend the complaint.

The Third Amended Complaint was filed on May 31, 2012. Nationwide filed another motion for summary judgment, which was denied by Court Order dated May 20, 2013 on the grounds that there were material issues of fact in dispute.[1] A non-jury trial on the Third Amended Complaint took place as scheduled in January 2014. The parties submitted post-trial briefs rather than closing arguments at the conclusion of the trial. This is the Court's decision after trial.

---

[1] The Third Amended Complaint survived a motion for summary judgment. The Court specifically rejected Nationwide's contention that the causes of action set forth in the Third Amended Complaint could be resolved as a matter of law because there were material issues of fact in dispute. Despite the Court's May 20, 2013 ruling denying the motion for summary judgment on the Third Amended Complaint, Nationwide has persisted in its argument that the Court's rulings by Memorandum Opinions dated September 14, 2010 and May 24, 2012 require that the Court now rule, as a matter of law, that Nationwide is entitled to judgment because of the legal rulings issued previously. However, had Nationwide been entitled to judgment as a matter of law, the Court would have granted, and not denied, Nationwide's motion for summary judgment on the Third Amended Complaint. The issues presented at trial were not foreclosed by the Court's prior legal rulings. In other words, law of the case does not operate as a bar to NorthPointe's claims presented at trial.

## III.    THE COURT AS FINDER OF FACT

The Court begins with the fundamental observation that each party bears the burden of proving its claims by a preponderance of the evidence. In this regard, the Court must be mindful that, if the evidence presented by the parties during trial is inconsistent and the opposing weight of the evidence is evenly balanced, then "the party seeking to present a preponderance of [the] evidence has failed to meet its burden."[2]

The Court heard the testimony of nineteen witnesses and considered scores of documents and demonstrative exhibits. As fact-finder, the Court followed the direction that is regularly given to juries when assessing the evidence and the credibility of witness testimony:

> I must judge the believability of each witness and determine the weight [to be] given to all trial testimony. I considered each witness's means of knowledge; strength of memory and opportunity for observation; the reasonableness or unreasonableness of the testimony; the motives actuating the witness; the fact, if it was a fact, [that] the testimony was contradicted; any bias, prejudice or interest, manner or demeanor upon the witness stand; and all other facts and circumstances shown by the evidence which affect the believability of the testimony. After finding some testimony conflicting by reason of inconsistencies, I have reconciled the testimony, as reasonably as possible, so as to make one

---

[2] *Eskridge v. Voshell,* 593 A.2d 589 (Del.1991) (ORDER), (citing *Guthridge v. Pen-Mod, Inc.,* 239 A.2d 709, 713 (Del.Super.1967)).

harmonious story of it all. To the extent I could not do this, I gave credit to that portion of testimony which, in my judgment, was most worthy of credit and disregarded any portion of the testimony which, in my judgment[,] was unworthy of credit.[3]

## IV.  FINDINGS OF FACT

### 1.  Nationwide's Changing Structure and Business Philosophy

Nationwide took great pains and went to great lengths to establish at trial that Nationwide is a vast and complex corporate entity, with scores of units, offices that are geographically widespread, and many employees.[4] Moreover, during the time period at issue in the dispute before the Court, there were several very significant management changes that were accompanied by tectonic shifts in investing strategies, philosophy, and approach to Nationwide's relationship to NorthPointe.

Nationwide Fund Advisors ("NFA") managed investment strategies for Nationwide. There were four presidents of NFA during the time before and after

---

[3] *Dionisi v. DeCampli,* 1995 WL 398536, *1 (Del. Ch. June 28, 1995).

[4] To Nationwide's credit, with only one exception, no effort was made at trial to use the fact that there are various Nationwide units involved in this dispute as a shield against Nationwide's responsibilities to NorthPointe. Although Nationwide strenuously objected to any liability to NorthPointe and forcefully insisted that NorthPointe owes a significant amount of money to Nationwide, Nationwide's presentation presumed a singular entity for the tort and contract analysis. The only exception was Nationwide's counsel's cross-examination of Professor Wermers which was a strategic anomaly.

the MBO. In addition to the four different persons in the role and function of NFA president, NorthPointe eventually dealt with 16 different Nationwide accountants.

Paul Hondros was president of NFA when NorthPointe was first approached to buy-out Nationwide's ownership interest. In May 2007, Hondros left his position as president of NFA, and was replaced by John H. Grady. In January 2008, Grady was replaced by Stephen Timothy Grugeon, who was acting president on an interim basis. Subsequently, Michael P. Spangler became president of NFA on June 30, 2008. He was the fourth president in only three years.[5]

Hondros drove the NFA strategy of a direct-management investment model in 1999 when NP Capital was first created.[6] While Hondros was president of NFA, in or about October 2006, Grady joined Nationwide as an independent contractor. In May 2007, Grady was named an officer of Nationwide. According to Nationwide, Grady's responsibility was to complete the strategic shift to a subadvised platform so that Nationwide would be divested of its direct asset management role.

---

[5] At that time, Grugeon reverted to his role as reporting to the president and Grugeon reported to Spangler.

[6] Hondros was not called to testify as a witness.

7

Grady oversaw Nationwide's divestment of the funds it directly managed, while it moved to a subadvised model.[7] Grady was Nationwide's "face and voice for conversations with Michael Hayden."[8] Prior to the MBO, Hayden was NorthPointe's Managing Director. Hayden became NorthPointe's Chief Executive Officer after the MBO.

On January 31, 2008, Grady left Nationwide. While Grady was president of NFA, Tim Grugeon reported to Grady.[9] When Grady left Nationwide, Grugeon replaced Grady as acting president of NFA.[10] Spangler became president of NFA on June 30, 2008.[11]

---

[7] Grady testified as a witness regarding his role with Nationwide from October 2006 through January 31, 2008. Grady was the only Nationwide witness who testified at the trial who is no longer employed by Nationwide. The Court found Grady to be a credible and reliable witness who had no stake in the outcome of the case.

[8] Tr. Transcr. Grady at 221:11-12 (Jan. 23, 2014).

[9] Grugeon's demeanor was defensive and suggested that he was very reluctant to testify as a witness. The Court found that Grugeon was an evasive witness. He made every effort to avoid answering the questions posed to him.

[10] Other Nationwide witnesses testified that Grugeon was acting president and this characterization was adopted by Nationwide's counsel at trial. However, Grugeon described his role at NFA from February through June 2008 as "acting head" and not as "acting president." Regardless of whether Grugeon ever had the actual title of "acting president," he acted in this role on an interim basis.

[11] Spangler also testified at trial. The Court found that Spangler was a reluctant and evasive witness. His entire demeanor suggested an intention to avoid any responsibility whatsoever. Efforts to clarify details of his testimony were met with derision.

The Court finds that high turn-over in key positions at Nationwide resulted in institutional incompetence. David Wetmore, who testified as a witness, has been Chairman of the Board of Trustees of Nationwide Mutual Funds ("Board") since 2005. He testified that he has more than 20 years of experience on boards related to investment vehicles for trust funds such as the NorthPointe NVIT. Wetmore conceded that he had concerns about the rotating presidency at NFA, suggesting that the turnover made it difficult for Nationwide to have consistent policies.

In addition to the turmoil at NFA, Nationwide's trial presentation emphasized the distinction between the business unit in the Columbus, Ohio office and the investment unit in the Conshohocken, Pennsylvania office. There was often a significant disconnect in business and strategy decisions. In about May 2006, at the same time that NFA in Conshohocken was pursuing the MBO as a mutually beneficial undertaking, certain persons within Nationwide's Columbus business office began recommending that NP Capital be replaced as a subadvisor by name-brand managers, such as Gartmore. Significantly, there were no Nationwide employees from the Columbus office who were involved in the MBO negotiations.

Grady acknowledged the disconnect between these two Nationwide offices and tried to correct it. Grady testified that he made efforts to bring the Columbus business unit under his direct authority as NFA president in order to correct the

9

strategic disconnect. However, Grady's tenure was short-lived and his efforts did not come to fruition. To the contrary, the Court concludes that, ultimately, it was the decision-making in Columbus and at NFA under Spangler's leadership that brought about Nationwide's failure to meet its obligations under the Purchase Agreement. Once Spangler became NFA president, the tone of Nationwide's relationship with NorthPointe changed entirely and deteriorated completely. Communication ceased for all intents and purposes.

## 2. NorthPointe and Nationwide's Relationship prior to the MBO

Nationwide's ownership interest in NP Capital was profitable. Prior to the MBO, Nationwide received approximately $15 million in profits annually from NP Capital. As sixty-five percent (65%) owner of the entity, Nationwide had access to all of NP Capital's expense and financial information. Nationwide also monitored NP Capital's performance and was intimately familiar with NP Capital's performance history. From time to time, NP Capital's funds were placed on "watch lists" and "close review lists" if the funds were not meeting certain well-defined performance standards; but placement on these lists was temporary. Several witnesses for Nationwide and NorthPointe testified that it is not unusual for funds to be placed on these lists periodically.

The working relationship between NP Capital and Nationwide was excellent prior to the MBO. NP Capital managed seven funds for Nationwide and, from 1999-2007, Nationwide had a very "hands on" relationship with NP Capital. NorthPointe's Hayden spoke to Hondros or a member of Hondros' NFA team every business day. Hayden testified that he had a personal relationship with several Nationwide persons. NorthPointe had no reason to expect that its close working relationship with Nationwide would change after the MBO. Indeed, according to Grady who was directly involved in negotiating the MBO on Nationwide's behalf and according to NorthPointe, it was accepted by the parties on both sides of the transaction that the MBO would benefit both NorthPointe and Nationwide.

### 3. Nationwide's New Multi-Managed NVIT Mid Cap Growth Fund

In 2006, prior to the signing of the Purchase Agreement, Nationwide first began to plan a Multi-Managed NVIT Mid Cap Growth Fund ("Nationwide Multi-Managed NVIT"), which was a fund with a similar investment strategy as the NorthPointe NVIT. Although the mere creation of the new Nationwide Multi-Managed NVIT neither amounted to fraud nor breach of contract, as discussed below, Nationwide's strategic decision to keep the fees charged to investors artificially low in the Nationwide Multi-Managed NVIT created a tremendous incentive for investors to choose the Nationwide Multi-Managed NVIT over the NorthPointe NVIT. With respect to the cap on fees for investors, Grugeon claimed

11

that Nationwide did not want new investors to experience a high expense ratio. Professor Russell Richard Wermers testified that, when everything else about two funds is virtually equal, most investors will gravitate to the fund with lower fees.

The Court finds that Nationwide did not disclose the creation of the Nationwide Multi-Managed NVIT to NorthPointe. Many Nationwide witnesses testified that the creation of the Multi-Managed NVIT was not disclosed to NorthPointe.[12] As discussed below, the Court finds that Nationwide breached the covenant of good faith and fair dealing, not by creating the Nationwide Multi-Managed NVIT and not by failing to disclose its existence to NorthPointe, but by setting up the fee structure as it did, and also for the other reasons discussed in detail below.

### 4. Nationwide's Proposal for the Management Buy-Out And Expectation for an Enhanced Business Relationship

Nationwide initiated the MBO discussions.[13] When presenting the MBO proposal to NorthPointe, Nationwide suggested that the relationship between

---

[12] Grady testified that he did not recall discussing with NorthPointe the fact that Nationwide had created the Nationwide Multi-Managed NVIT. Grugeon testified that he was not aware of any notification to NorthPointe about the Nationwide Multi-Managed NVIT. Harold Schafer, a Nationwide employee of more than 20 years, testified that he was not aware of anyone at Nationwide sharing with NorthPointe the fact that Nationwide was launching the Nationwide Multi-Managed NVIT. Thomas R. Hickey, a Nationwide witness, conceded at trial that he never told NorthPointe about the Nationwide Multi-Managed NVIT.

[13] With one exception, the witnesses all testified that Nationwide initiated the MBO discussions in June 2006. That exception was the testimony offered by Nationwide's Hallowell. According to Hallowell, Nationwide's Steve Bain, the Nationwide employee responsible for strategic

Nationwide and NorthPointe would be enhanced. According to Nationwide, once NorthPointe was unaffiliated with Nationwide, Nationwide could direct more assets to the funds under NorthPointe's management. According to Cahill, Nationwide expressly suggested that the relationship between NorthPointe and Nationwide would be enhanced after the MBO Closing. Grady also stated that he discussed with Nationwide that the profile of certain funds would be improved, and would be "raised" by Nationwide under the new management agreement.

Grady was committed to maintaining–and even enhancing–the relationship between Nationwide and NorthPointe after the MBO. Grady specifically stated that it was not his intention to terminate the relationship with NorthPointe. Rather, the Purchase Agreement and related documents were the basis for an anticipated on-going business relationship.

NorthPointe was interested in acquiring the revenue stream from the management of the funds, but was also interested in an on-going affiliation with Nationwide. According to Peter Cahill, Chief Investing Officer of NorthPointe, the relationship with Nationwide provided NorthPointe with "instant credibility" with NorthPointe's institutional clients and would help NorthPointe manage larger

decision-making, told Hallowell that NorthPointe was interested in buying out Nationwide's interest in NP Capital. The Court rejects Hallowell's testimony as inconsistent with the weight of the evidence to the contrary.

volumes of assets.[14]  Moreover, NorthPointe sought Nationwide's continued retail exposure after the Purchase Agreement was signed.

## 5.  Price Negotiations

The MBO price negotiations between Nationwide and NorthPointe were extensive and took place over many months.  Hallowell attended a June 2006 business dinner at which the MBO was first discussed. It was Bain and Michael Hayden who set up the dinner meeting in mid-2006 in Columbus at which the parties first discussed the proposed MBO.  Hayden, who testified as a trial witness, was NP Capital's Managing Director at this time.  Hayden became NorthPointe's CEO in 2007 after the MBO.

After the June 2006 business dinner, NorthPointe's Hayden continued purchase discussions with Nationwide's then-president Grady, presenting NorthPointe's first offer in December 2006 for $16 million cash.[15]  This offer was based on "a [multiplier] of eight (8.00) times estimated Trailing Twelve Months EBITDA for subadvisory fee income and four (4.00) times estimated Trailing Twelve Months EBITDA for subadvisory fee income . . . with respect to the 65% ownership percentage of Nationwide."[16]  The December 21, 2006 offer letter noted

---

[14] Tr. Transcr. Cahill at 83:8-12 (Jan. 23, 2014).

[15] *See* Tr. Ex. 24.

[16] *Id.* at 1.

that NorthPointe would consider raising the offer price if Nationwide would include a full purchase-price clawback provision if the subadvisory agreement were cancelled any time during the five years following the MBO. This offer did not include any other protections for NorthPointe. The $16 million cash offer was rejected by Nationwide because Nationwide wanted a higher purchase price.

NorthPointe's second offer was made on February 2, 2007 for $21 million and included a $5 million clawback provision.[17] This offer included an increase in purchase price of $5.2 million in the form of a proposed note. According to Hayden, the note created an incentive for Nationwide to maintain the subadvisory agreement for 36 months because Nationwide would have an interest in NorthPointe repaying the note. This offer was rejected by Nationwide although the concept for the clawback provision was retained.

NorthPointe's final offer was in May 2007 for $25 million, and included the negotiated protections for NorthPointe, as discussed below. Per the final offer, NorthPointe would pay $16 million in cash and execute a note in the amount of $9 million personally guaranteed by the NorthPointe individual investor/owners.[18]

---

[17] *See* Tr. Ex. 31.

[18] It was estimated that NorthPointe would generate $9 million in revenue over the three-year period after the Closing. This is exactly the amount of money owed by NorthPointe in the note to Nationwide. Had NorthPointe not negotiated the extra protections when the purchase price was raised from NorthPointe's $16 million offer to the $25 million purchase price, NorthPointe would not have agreed to pay the extra $9 million.

According to NorthPointe's Cahill and Hayden, as well as Nationwide's Grady, NorthPointe was paying significantly more to have additional protections included and was insistent on the protections that were ultimately memorialized in Exhibit D of the Purchase Agreement, as discussed below.

### 6. Nationwide was the Price-Setter

Merrill Lynch was retained by Nationwide to assist Nationwide in assessing the value of its subadvisory funds, including the NorthPointe funds. Merrill Lynch identified NorthPointe's "[h]istory of consistent investment results through . . . quantitative and fund research."[19] Merrill Lynch also noted NorthPointe's superior performance when compared to the mutual fund industry and industry benchmarks.[20] The Court accepts Merrill Lynch's 2007 valuation of the funds at issue. The Court finds that Merrill Lynch is a reliable source for this information. The Merril Lynch evaluation provides an independent snapshot of Northpointe's performance in 2007.

The Court rejects Nationwide's contention that it was a price-taker and not a price-setter. The record evidence is to the contrary. Nationwide initiated the buy-out discussions and drove those discussions. Hallowell testified about the price negotiations. According to Hallowell, "ultimately, what matters is how much [the

---

[19] Tr. Ex. 37.

[20] *Id.*

purchaser] is willing to pay"[21] and that the parties "need to agree on how much cash is going to be exchanged." [22]

Indeed, even Nationwide's expert witness, David Marcus, contradicted Nationwide's argument that it was a price-taker. According to Marcus, the purchase price depends on which party has more negotiating power. It was clearly established by the record evidence that Nationwide yielded substantially more negotiating power. Marcus pointed out that the transaction price can move away from a calculated value because of the discrepancy in relative bargaining power. Marcus testified that the "value" of the company may be different than the purchase price.[23]

When Nationwide rejected NorthPointe's $16 million cash offer, Nationwide had access to all of NorthPointe Capital's expense and finance information. According to Hayden, Merrill Lynch and Nationwide came up with an increased price for NorthPointe Capital based on growth projections. The $25 million offer was based, in part, on Merrill Lynch's valuation of NP Capital of between $53 and $60 million. The calculations by Nationwide and Merrill Lynch

---

[21] Tr. Transcr. Hallowell 77:15-17 (Jan. 30, 2014).

[22] *Id.* at 77:19-20.

[23] Tr. Transcr. Marcus 62:8-15 (Jan. 31, 2014).

were based on more aggressive growth potential than that on which NorthPointe based its initial offers.

### 7. The Deal and Purchase Agreement

The Purchase Agreement was signed on July 19, 2007 and the Closing Date was September 28, 2007. The MBO between Nationwide and NorthPointe had five key elements:

1. $25 million purchase price ($16 million in cash which NorthPointe borrowed from RBS Citizens, N.A. ("RBS") and $9 million in a note, guaranteed by the seven individual owners of NorthPointe Holdings, LLC);

2. Termination fees were required to be paid if the subadvised agreement was terminated within three years of the Closing Date;

3. Nationwide was not permitted to replace NorthPointe as subadvisor for the NorthPointe NVIT, and Nationwide agreed not to engage a concurrent subadvisor for the NorthPointe NVIT;

4. Nationwide was required to retain the branding of the NorthPointe-branded funds for 18 months as NorthPointe-branded funds; after 18 months, Nationwide was required to discuss transfer of these funds to NorthPointe; and

5. Nationwide was required to support NorthPointe with marketing campaigns.

## 8. Disclosures to the Board Prior to and After the MBO

Presentations were made to the Board about NorthPointe at several Board meetings. In December 2007, Nationwide made a presentation to its shareholders and lauded the performance and stature of NorthPointe as a high quality investment advisor that was unaffiliated with Nationwide.[24] This presentation contrasts remarkably with Nationwide's later claims that NorthPointe was underperforming during this exact same time period.

On June 7, 2007, materials were provided to the Board relating to the review of the proposed MBO. The memorandum discloses to the Board that Nationwide "agree[d] not to take any action to terminate NorthPointe as a subadvisor to any of the [funds] during the three-year period following the closing of the [t]ransaction."[25] That Nationwide would have to make "appropriate penalty payments to the NorthPointe partners" under certain circumstances was also disclosed to the Board.[26]

---

[24] *See* Tr. Ex. 139.

[25] Tr. Ex. 74.

[26] *Id.*

At a Board meeting in June 2008, after the MBO, Grugeon reviewed a strategic report regarding the Nationwide funds subadvised by NorthPointe. The meeting notes state "Grugeon indicated that management expected to present a strategic recommendation at the next regularly scheduled meeting of the Board"[27] regarding the potential reorganization of NorthPointe as subadvisor.

9. **Nationwide's Authority to Terminate the NorthPointe Subadvisory Agreement and Protections for NorthPointe (Exhibit D)**

Grady was involved in the drafting of the Purchase Agreement on an episodic basis. He was brought in by Nationwide to address specific issues. Grady testified that he was involved in drafting Exhibit D which sets forth Nationwide's authority to terminate funds but also required payment of specified termination fees for non-permitted terminations. Grady stated that Nationwide had the power under Exhibit D to terminate the subadvisory agreement. Grady emphasized that shareholder approval would be required to terminate or merge the funds.

According to Grady, under certain conditions, Nationwide would not owe a termination fee to NorthPointe. There were certain limited permitted terminations expressly identified and defined in the Purchase Agreement as "Permitted Terminations." It was Grady who insisted that the Purchase Agreement allow Nationwide to terminate without penalty if the termination was required by

---

[27] Tr. Ex. 179, at 29.

Nationwide's fiduciary duty. According to Grady, it was preferable if objective criteria were agreed-upon in advance. With objective criteria and a defined penalty, according to Grady, there was a known consequence for Nationwide if it exercised its fiduciary duties in a way that impacted NorthPointe's subadvised funds.[28]

Exhibit D includes several contractual provisions that offer protection to NorthPointe. Under Section 1(a) of Exhibit D, Nationwide agreed that for a three-year period it would not terminate the subadvisory agreement pursuant to funds in Schedule 1 to Exhibit D.[29] Under Section 1(b) of Exhibit D, Nationwide agreed it would not replace NorthPointe or engage a concurrent subadviser with respect to the NorthPointe NVIT and also agreed that the NorthPointe NVIT would have at least $300 million in AUM.[30] Section 5 of Exhibit D obligated Nationwide to continue using the "NorthPointe" name on the two small cap funds for at least 18 months after Closing, and to consult with NorthPointe about transferring sponsorship of these funds to NorthPointe after those first 18 months had passed.[31]

---

[28] The final version of the term sheet incorporates the changes made by Grady.

[29] Purchase Agreement, Tr. Ex. 88.

[30] *Id.*

[31] *Id.*

The record evidence demonstrated that there are two typographical errors in Exhibit D. [32] First, Schedule 1 to Exhibit D incorrectly states that it is applicable to the Nationwide NVIT. Rather, the preponderance of the evidence established that Schedule 1 applied to the Nationwide Mid Cap Growth Fund and not the Nationwide NVIT. Second, it was established that "restricted period" should read "date of termination."

## 10. Three-Year Restricted Period (Section 1(a) of Exhibit D)

Under Section 1(a) of Exhibit D, Nationwide agreed that, for a three year period after the Closing ("Restricted Period"), it would not terminate the subadvisory agreement for the funds in Schedule 1 to Exhibit D. However, if termination was either necessary for Nationwide to meet its fiduciary duties or if NorthPointe's funds failed to meet the performance standards in Schedule 2 to Exhibit D for five (5) consecutive quarters or three (3) consecutive years, then the termination is a Permitted Termination. Hayden and Grady both testified regarding the parties' negotiations of protections for both sides: Nationwide's ability to exercise its fiduciary duties and NorthPointe's guarantees that subadvisory

---

[32] The witnesses involved in drafting all agreed that Schedule 1 to Exhibit D included typographical errors. The Court accepts the testimony of Cahill as credible and reliable that the NorthPointe NVIT should not have been listed on Schedule 1 to Exhibit D. Rather, the Nationwide Mid-Cap Growth Fund should have been included.

agreements not be terminated or, if terminated within the Restricted Period, that NorthPointe be compensated for the termination.

As discussed below, by letter dated November 25, 2008, Nationwide terminated four funds within the Restricted Period. NorthPointe expressly negotiated a very specific standard that was lower than other industry standards. NorthPointe is entitled to the benefit of its bargain. As noted below, the Court finds that these were not Permitted Terminations and finds that the termination fees set forth in Section 1(a) were due and owing.

**11. Protections for NorthPointe NVIT (Section 1(b) of Exhibit D)**

Section 1(b) of Exhibit D set forth the terms and conditions to protect NorthPointe's interests in the NorthPointe NVIT. According to Grady, it was necessary for Nationwide to retain the option of redeeming assets in the NorthPointe NVIT, but Nationwide could agree–and did agree–not to replace NorthPointe as the subadvisor of the NorthPointe NVIT.

Grady testified that Hayden had a "searing memory" of a prior business relationship where another subadvisor was added and the relevant fund lost assets.[33] Grady testified that Section 1(b) of Exhibit D was created to address this very specific fear and provides a well-delineated protection. Specifically,

---

[33] Tr. Trans. Grady 246:5-22 (Jan. 23, 2014).

according to Grady, there would be protections for NorthPointe if Nationwide caused economic harm but did not terminate the subadvisory relationship.

For NorthPointe, according to Grady, it was also important to protect the size of the NorthPointe NVIT. According to Grady, NorthPointe wanted to be protected from a sharp reduction in the NorthPointe NVIT's AUM. Grady was emphatic that Nationwide had certain fiduciary obligations to its shareholders that mandated that Nationwide have the ability to take action regarding the funds. Nevertheless, according to Grady, the protections for NorthPointe detailed in the Purchase Agreement addressed NorthPointe's concerns. There would be known consequences for certain actions by Nationwide. Moreover, according to NorthPointe witnesses, these assurances and agreed-upon objective criteria are what ultimately led NorthPointe to agree to pay $25 million for the purchase and for each of the partners to sign a personally guaranteed note.

### 12. Protections for NorthPointe-Branded Funds (Section 5 of Exhibit D)

Section 5 of Exhibit D obligated Nationwide to continue using the "NorthPointe" name on the two small cap funds for at least 18 months after Closing, and to consult with NorthPointe about transferring sponsorship of these funds to NorthPointe after those first 18 months had passed.[34] Despite these contractual obligations, Nationwide terminated both small cap funds prior to the

---

[34] Purchase Agreement, Tr. Ex. 88.

expirations of 18 months, and also failed to discuss transferring sponsorship to NorthPointe.

The Court rejects Nationwide's contention that the funds were not terminated until April 30, 2009. Although Nationwide's November 25, 2008 letter claimed that the two small cap funds would be terminated no later than April 30, 2009, Nationwide actually ceased accepting deposits almost immediately after the Board approved the terminations on December 3, 2008. Spangler conceded that no one at Nationwide made any effort to comply with Nationwide's contractual obligation to discuss transfer of sponsorship for these funds to NorthPointe.

## 13. The Performance Standards (Schedule 2 to Exhibit D)

Exhibit D of the Purchase Agreement provided that Nationwide could terminate the subadvisory relationship if NorthPointe did not meet certain performance standards. The performance standards were negotiated and set forth in Schedule 2 to Exhibit D. Shortly after Grady's departure and Grugeon's interim appointment, Nationwide started to claim that NorthPointe was underperforming. As set forth below, the Court rejects Nationwide's contentions that NorthPointe was in violation of the performance standards.

## (i) NorthPointe Satisfied Concerns Raised by Nationwide

Robert D. Glise was responsible for investing on behalf of the NorthPointe NVIT from 2002 through 2008.[35] Glise testified regarding his quarterly reports to in the Columbus-based Nationwide office, during which Glise was questioned extensively about the performance of the NorthPointe funds. In addition, Glise was invited to speak to the Nationwide Board from time to time.

Glise explained that NorthPointe's investing philosophy was focused on value, not on growth. It was important, according to Glise, to stick to a disciplined and consistent value philosophy in managing the mutual funds. However, in or about the second quarter of 2007, many investors in the market were focused on growth, a significantly more volatile approach than a value philosophy.

Glise understood that Nationwide supported NorthPointe's value-based approach. Specifically, according to Glise, Nationwide recognized in the second quarter of 2007 that the strategy of NorthPointe's NVIT was not consistent with the market preference at that time. Following an all-time market high on October 9, 2007, there was a significant reduction in market valuations across all asset classes. The Court rejects Nationwide's contention that its shift in strategy with respect to

---

[35] Glise was a consistent, credible witness. During cross-examination by Nationwide, an effort was made to impeach Glise's with his deposition testimony. However, the Court found Glise's testimony at trial was consistent with his deposition testimony.

the NorthPointe's funds took place only after the market crashed. For example, this argument is inconsistent with the record evidence which shows that Nationwide's planning for a competing NVIT started well before October 2008.

**(ii) The Performance Standards Were Not Meant to be "Annualized"**

The Court rejects Nationwide's contention that the performance standards were meant to measure results on an annualized basis. Although Professor Wermers testified that an annualized average is the industry standard for performance review, NorthPointe *had negotiated* a different standard which was memorialized Schedule 2 to Exhibit D in the Purchase Agreement. Thus, according to Professor Wermers and others, it was significant that NorthPointe had expressly negotiated a standard different from the industry standard.

Hallowell testified that the performance standards were based on an "annualized" assessment, which "is the industry standard way to look at it."[36] While this may be an accurate portrayal of the industry standards, Hallowell also testified that he was not involved in the drafting of Schedule 2 or any discussions with NorthPointe about the performance standards. Because Hallowell did not participate in the drafting process, his testimony on this point is not meaningful or controlling. Also, Hallowell said that he did not know whether NorthPointe was

---

[36] Tr. Transcr. Hallowell 55:22-23–56:1 (Jan. 30, 2014).

already in violation of the performance standards at the time of Closing. Spangler also testified regarding the performance standards. Incredibly, Spangler offered this testimony after first insisting that he had never read the Purchase Agreement or the subadvisory agreements.[37]

Nationwide's final witness was Erik Sirri, who testified as an expert on business issues in the mutual fund industry. Although Sirri was a credible witness, his testimony offered little on the specific issues in dispute in this case. Sirri did not conduct an independent review or analysis of NorthPointe's performance. With respect to measuring performance standards, Sirri testified that Nationwide and the Board's review and process for evaluating performance was consistent with industry standards. However, Sirri did not offer testimony about the negotiated performance standards and Sirri offered no opinion on whether NorthPointe violated the performance standards set forth in the contract. Sirri stated that he was not asked to form an opinion on this issue by Nationwide.[38] Nationwide opted not to ask its own expert witness to opine on this question and instead relied upon the very Nationwide witnesses whose conduct is at issue in this lawsuit.

The Court assigns the plain meaning to the Purchase Agreement's words in Schedule 2 to Exhibit D. "Five consecutive quarters" means five quarters in a row

---

[37] The Court rejects Spangler's testimony as unreliable.

[38] Tr. Transcr. Sirri 183:21-23–84:1-4 (Jan. 31, 2014).

and "three consecutive years" means three years in a row. Thus, the Court finds that the specifically negotiated performance standards were not meant to be annualized, but rather on a consecutive quarterly or yearly basis.

### (iii)    The Performance Standards Were Prospective, Not Retroactive

The Court also rejects Nationwide's contention that the performance standards applied retroactively. Section 1(a) of Exhibit D is consistent with a prospective performance review in that it provides that Nationwide will owe certain fees if it terminates within three years after Closing. NorthPointe's performance must be analyzed after the Closing, and not before it took place.

### (iv)    NorthPointe Met the Performance Standards

As noted previously, the Court rejects Nationwide's contention that NorthPointe's performance was to be calculated retroactively and on an annualized average basis. When NorthPointe's performance is calculated prospectively using the calculations set forth in Schedule D, NorthPointe met the performance standards. Accordingly, as discussed below, Nationwide's termination was NOT a Permitted Termination and Nationwide's claims to the contrary were a breach of the covenant of good faith and fair dealing, as noted below.

Glise and Gardner insisted that they "ran the numbers" and that NorthPointe never had five consecutive quarters or three consecutive years in the bottom third

of the comparative measures. Glise and Gardner were unable to recreate Nationwide's claims that NorthPointe had failed the performance standards. The Court accepts Glise's testimony that NorthPointe consistently outperformed industry benchmarks from 1998 through 2011. In addition, the Court accepts Gardner's analysis that NorthPointe met or exceeded the contractual performance standards. The Court finds that none of the funds failed to meet the performance standards for either five consecutive quarters or three consecutive years after Closing.

**(v)   Nationwide's Claims that NorthPointe Under-Performed Was Inconsistent with Nationwide's Own Representations to Its Board**

Nationwide urged its Board and its shareholders in December 2007 to approve the NorthPointe MBO. On the other hand, at trial, Nationwide argued that its terminations were required for Nationwide to act in the best interests of its shareholders and to comply with its fiduciary duties. But both of these contentions cannot be accurate. In December 2007, either (i) NorthPointe was in compliance with the performance standards such that Nationwide's presentations to the Board and shareholders were accurate or (ii) NorthPointe had already fallen below the standards and Nationwide made false representations to its own Board and shareholders in December 2007.

The Court finds that Nationwide's representations to its Board and shareholders were accurate in December 2007 because NorthPointe was in compliance with performance standards. Accordingly, Nationwide's litigation posture to the contrary is rejected by the Court. For example, John Grady, on behalf of Nationwide, reported to Nationwide's shareholders that NorthPointe's performance was very good and that the Board did not anticipate any change in the nature or quality of services after the managed buy-out. Moreover, Nationwide stated "[n]o material changes have taken place or are anticipated" in the new subadvisory agreements with NorthPointe.[39] Also, according to Merrill Lynch's favorable review in 2007, NorthPointe had a history of consistent investment results.[40] Merrill Lynch's valuation report also highlighted NorthPointe's performance as exceeding the market norms.

Moreover, the Court accepts the claims that the NorthPointe deal team analyzed NorthPointe's performance under the proposed performance standards before agreeing to be subject to those standards.[41] According to Cahill, to get a gauge for NorthPointe's performance, the NorthPointe deal team analyzed NorthPointe's performance for each fund using the performance standard that would be adopted in Exhibit D.

---

[39] Tr. Ex. 139, at 2.

[40] Tr. Ex. 37.

[41] The deal team consisted of Cahill, Petherick, and Hayden.

The Court finds that NorthPointe met the performance standards. The Court also finds that Nationwide's litigation claims that NorthPointe violated the performance standards was a theory developed to avoid paying termination fees for its business decisions and damages for its breach of contract.

**14. Nationwide's Looting of Assets from the NorthPointe NVIT**

Prior to signing the purchase agreement, the NorthPointe NVIT had $343 million in AUM in December 2006 and $440 million in AUM in July 2007. The day after Spangler became president, on July 1, 2008, Nationwide withdrew $260 million from NorthPointe's NVIT. This asset redemption reduced the capital base of the NorthPointe NVIT to $174 million. On the very same day, Nationwide invested $135 million into the new Nationwide Multi-Managed NVIT.

The new Nationwide Multi-Managed NVIT had no track record to which NorthPointe's performance could be compared, as the new fund had only existed for three months. Nationwide argued at trial that the transfer decision was based on comparative track records. The Court finds this claim to be disingenuous. Indeed, Hickey conceded that he could not compare the long-term performance of the Nationwide Multi-Managed NVIT to the NorthPointe NVIT. Hickey agreed that he could only review five months of performance for the Nationwide Multi-Managed NVIT.

The Court finds that Nationwide's redemption of funds from the NorthPointe NVIT was devastating to NorthPointe. More importantly, it was a breach of contract by Nationwide, as discussed below. This significant reduction in the NorthPointe NVIT directly and negatively impacted NorthPointe's viability and profitability. According to Professor Wermers, the forced redemption of $260 million was almost a "death toll" to the NorthPointe NVIT.[42] The declining asset base forced NorthPointe to cover its fixed fees, resulting in further loss. In addition, the Nationwide Multi-Managed NVIT's fees were waived and therefore had a lower expense ratio.[43] There was no way that the NorthPointe NVIT could compete with the Nationwide Multi-Managed NVIT under the circumstances engineered by Nationwide.

## 15. The "Meeting" on October 24, 2008

After the devastating NVIT asset redemption, NorthPointe was panicked and frantically sought a meeting with Nationwide. After months of requests for a meeting, Nationwide scheduled a meeting for October 24, 2008 in Pennsylvania. The NorthPointe individuals traveled to Pennsylvania from Michigan. The meeting lasted less than 15 minutes and the length and tenor of the meeting was representative of an entirely new and hostile relationship authored by Nationwide.

---

[42] Tr. Transcr. Wermers 308:9-15 (Jan. 28, 2014).

[43] In addition, Professor Sirri testified that, if you decrease fees, the fund will grow its assets.

33

This relationship was completely different from NorthPointe's relationship with Nationwide under Hondros' and Grady's leadership.

**16. Nationwide's November 25, 2008 Termination Letter**

By letter dated November 25, 2008, Nationwide addressed six of the seven NorthPointe funds.[44] Specifically, the letter informed NorthPointe that Nationwide was recommending to the Board that NorthPointe be terminated as subadvisor of the (i) Nationwide Micro Cap Equity Fund, (ii) Nationwide Mid Cap Growth Fund, (iii) NorthPointe Small Cap Growth Fund, and (iv) NorthPointe Small Cap Fund. The letter also stated that Nationwide recommended the merger of the NorthPointe NVIT with the Nationwide Multi-Managed NVIT. Finally, the letter stated that Nationwide was exploring alternative options for the Nationwide Value Opportunities Fund.

In recommending termination of the four funds, Nationwide claimed, among other things, that the performance of these funds was in the bottom quartile of their respective peer groups, that they were in the bottom third of their peer groups over a period of three consecutive years, and that some of the funds had underperformed

---

[44] Tr. Ex. 204.

their benchmarks. Nationwide stated that the underperformance failed to meet "Nationwide Standards."[45]

The timing of Nationwide's notice to NorthPointe was harmful to NorthPointe's interests and the interests of its institutional clients. The letter was sent late on a Friday afternoon, two days after the Board meeting, and after NorthPointe was closed for the day. In the meantime, and prior to notifying NorthPointe, Nationwide had already notified the SEC that these funds were being closed. As a result, NorthPointe's institutional clients could not make required deposits to their own accounts. The timing of Nationwide's actions denied these NorthPointe clients the opportunity to change their deposits in a timely manner. Discovery during the litigation revealed that even certain people within Nationwide's own organization took issue with the timing by Nationwide. As noted below, the timing of Nationwide's actions and Nationwide's failure to give proper notice to NorthPointe was a breach of the covenant of good faith and fair dealing and directly interfered with the viability of NorthPointe's business.

---

[45] The "Nationwide Standards" are the performance standards enumerated in Schedule 2 to Exhibit D of the Purchase Agreement. *See* Purchase Agreement, Tr. Ex. 88.

### 17. June 18, 2009 Termination of the Nationwide Value Opportunities Fund

Six months after the November 25, 2008 notice of termination of four funds, Nationwide's Board decided also to terminate the Nationwide Value Opportunities Fund. The Board's decision was reported to Hayden by letter dated June 18, 2009 in which Spangler notified NorthPointe that Nationwide was terminating the Nationwide Value Opportunities Fund.[46]

### 18. Merger of NorthPointe NVIT with Nationwide Multi-Managed NVIT

The NorthPointe NVIT was merged with the Nationwide Multi-Managed NVIT on February 6, 2009. Incredibly, Nationwide's stated reasoning was that NorthPointe had lost a substantial portion of its assets. This was disingenuous at best and completely failed to acknowledge Nationwide's own role when it raided NorthPointe's NVIT to fund the Nationwide Multi-Managed NVIT.

### 19. Ibbottson Did Not Direct Nationwide's Decision-Making

Nationwide argued that it had no discretion in making the decision to terminate the funds or in deciding to liquidate the NorthPointe NVIT and eventually merge the two NVIT funds. Nationwide's argument was that their advisor, Ibbottson, had recommended the actions taken by Nationwide, and that

---

[46] Tr. Exh. 231.

Ibbottson's recommendations were binding on Nationwide, and that Nationwide had no discretion once Ibbottson made these recommendations.

This assertion was not supported by any credible record evidence. Moreover, there was no contemporaneous mention of Ibbottson in any of the notifications from Nationwide to NorthPointe about the various terminations, redemptions, or mergers. Nationwide's argument with respect to its discretion to follow Ibbottson's recommendations also was inconsistent with the testimony of decision-makers at Nationwide.

Moreover, Professor Wermers stated that the evidence did not suggest that Ibbottson was the ultimate decision-maker in regard to the termination of the funds. Professor Wermers pointed out that the fees paid to Ibbottson by Nationwide, about $150,000 per year, were not enough to pay for just one portfolio manager, let alone the many portfolio managers retained to manage the funds. The Court accepts Professor Wermers' conclusion, which is supported by other record evidence, that Nationwide was the decision-maker. Even though Nationwide delegated certain functions to Ibbottson, Nationwide was the sole decision-maker with respect to the funds.

## 20. Nationwide's Litigation Position Is Not Consistent with the Testimony of Its Own Witnesses

Nationwide's position throughout trial was that it was necessary for Nationwide to terminate the various subadvisory agreements. Nationwide claimed various reasons for its need to act: that it was obligated to act in the best interest of its shareholders; that NorthPointe was in violation of the performance standards; and that Ibbottson advised Nationwide to do so. The Court finds that Nationwide's own witnesses contradicted and undermined its arguments. Nationwide's witnesses testified that they made their business decisions without regard to Nationwide's contractual obligations. Most witnesses claimed to have never read the Purchase Agreement.

Other than Grady, the Nationwide witnesses were evasive and made efforts to shift blame and escape responsibility. Grady was the only Nationwide witness who was willing to take responsibility for his role.[47] Every other Nationwide witness testified that the decision to terminate, liquidate, and otherwise eviscerate the various NorthPointe funds was made without consideration for the contractual obligations of Nationwide to NorthPointe. Each Nationwide witness, other than Grady, conceded that the decision-making took place without consideration for Nationwide's contractual obligations to NorthPointe.

---

[47] Grady is no longer employed at Nationwide and had no incentive to testify consistent with Nationwide's interests.

Nationwide witnesses were unreliable, especially with respect to their claims regarding whether they referenced the Purchase Agreement to inform their decisions. For example, Hickey stated that he had a role in drafting the November 25, 2008 termination letter and claimed Nationwide's actions were Permitted Terminations under the contract. However, Hickey then claimed not to have known the terms and conditions of the Purchase Agreement.

Similarly, although Wetmore and Grugeon denied any concern for Nationwide's contractual obligations to NorthPointe, they both also testified that the Board raised specific concerns about breach of the NorthPointe contract in discussing termination of the funds. Likewise, Grugeon himself conceded that even he did not know the details of the Purchase Agreement. According to Grugeon, Nationwide made a business decision to go in a different direction than the NorthPointe subadvised model. Grugeon also testified that he told the Board not to consider Nationwide's contract with NorthPointe in effectuating the change in strategy.[48]

Wetmore first insisted that the Board had "zero concern" about whether the Board's decisions would violate any of Nationwide's contractual obligations.[49] Despite this assertion, Wetmore later conceded that the Board received advice of

---

[48] Tr. Transcr. Grugeon 144-147 (Jan. 27, 2014).

[49] Tr. Transcr. Wetmore 201:6-14 (Jan. 30, 2014).

counsel about breaching the contract with NorthPointe. Wetmore admitted that he never reviewed the performance standards set forth in the NorthPointe contract because the Board had "zero concern" about whether its decisions would cost Nationwide money under the Purchase Agreement.[50] At best, Wetmore's attitude toward Nationwide's contractual obligations was cavalier; at worst, he was absolutely dismissive. Ultimately, his testimony is unreliable.

Thomas Hickey also testified as a Nationwide witness. Immediately upon beginning his testimony, Hickey tried to distance himself from the decision-making with respect to the NorthPointe funds by claiming that he became responsible for the NorthPointe funds and selecting subadvisors sometime in early 2008. On the other hand, at his deposition, Hickey accepted responsibility from mid-2007.[51] Hickey testified at trial that he had no information about the Purchase Agreement, including no information about the exhibits or schedules setting forth performance standards. Hickey's testimony undermined Nationwide's claims. Hickey is a Nationwide employee who claims to have direct responsibility for the NorthPointe funds during the critical time period, yet he claims to have known nothing about the performance standards that NorthPointe was supposedly violating.

---

[50] *Id.*

[51] There were significant inconsistencies between Hickey's deposition testimony and his trial testimony. He was not a credible or reliable witness.

Similarly, even though Spangler expressly testified that he had not read the Purchase Agreement or the subadvisory agreements, Spangler's June 18, 2009 letter refers specifically to Section 1(a) of Exhibit D when Nationwide notified NorthPointe that the Nationwide Value Opportunities Fund was being terminated and claimed that it was a Permitted Termination.[52]

## V. DISCUSSION OF THE PARTIES' LEGAL CLAIMS

### 1. NorthPointe's Fraud Claim

To establish a claim of fraud, the plaintiff must prove the following elements: (1) a false representation made by the defendant, usually a representation of fact; (2) knowledge or belief of the representation's falsity, or that the representation was made with reckless indifference to its truth; (3) intent to induce plaintiff to act or refrain from acting; (4) plaintiff's action taken in justifiable reliance of the false representation; and (5) that the plaintiff has suffered damage as a result of its reliance on the false representation.[53] Each of these elements must be proved by a preponderance of the evidence in order for plaintiff to prevail in a claim for fraud.[54]

---

[52] Tr. Exh. 231.

[53] *Lord v. Souder*, 748 A.2d 393, 402 (Del. 2000).

[54] *NYE Odorless Incinerator Corp. v. Felon*, 162 A. 504, 511 (Del. 1931).

NorthPointe contends that it was induced to pay a higher price ($25 million) for the MBO than the prices it had offered (first $16 million, and then $21 million); while at the same time that Nationwide was inducing NorthPointe to pay more, Nationwide was also engaged in a plan to terminate the agreements. NorthPointe points to Nationwide's creation of the Nationwide Multi-Managed NVIT (and all witnesses testified that the existence of this new fund was not disclosed to NorthPointe) and Nationwide's intention to replace the NorthPointe NVIT with the Nationwide Multi-Managed NVIT. Also, according to NorthPointe, Nationwide never communicated any performance concerns to NorthPointe at any time during the negotiations but NorthPointe learned in discovery, and Nationwide witnesses testified, that Nationwide's concerns pre-existed the MBO. Finally, NorthPointe contended that, during the negotiations of the MBO, Nationwide did not disclose to NorthPointe that Nationwide had decided on a new strategy that would de-emphasize non-name-brand funds.

As to the first element, the false representation may be a representation made in a contract between the parties.[55] Under the second element, reckless indifference is defined as "a conscious indifference to the decision's foreseeable

---

[55] *H-M Wexford LLC v. Encorp, Inc.*, 832 A.2d 129, 144-45 (Del. Ch. 2003).

42

results."[56] To satisfy the *scienter* requirement, the plaintiff must demonstrate that the defendant had an "intent to induce the plaintiff to act or refrain from acting."[57]

The Purchase Agreement allowed for termination of the subadviser agreement with NorthPointe. Grady testified that it was imperative that Nationwide have the flexibility to act in the best interests of its shareholders. Grady also testified that NorthPointe insisted it be protected in the event Nationwide did take such action. Thus, no fraud exists in the termination of the contract.

Moreover, the *scienter* intent requirement has not been proved by a preponderance of the evidence. NorthPointe has not demonstrated that Nationwide entered into the Purchase Agreement with the intent to induce NorthPointe into signing the Purchase Agreement by false representations. According to Grady, who was the president involved in negotiating and drafting the Purchase Agreement, Nationwide anticipated a continuing relationship with NorthPointe and it was not Grady's intent to terminate the Nationwide-NorthPointe relationship.

With respect to Nationwide's creation of the Nationwide Multi-Managed NVIT, Grady was aware that it was being developed by the Nationwide team in

---

[56] *Wolf v. Magness Constr. Co.*, 1994 WL 728831, at *5 (Del. Ch. Dec. 20, 1994), *citing Jardel Co., Inc. v. Hughes*, 523 A.2d 518, 529 (Del. 1987).

[57] *Gaffin v. Teledyne, Inc.*, 611 A.2d 467, 472 (Del. 1992).

Columbus but Grady understood that it would not impact the NorthPointe NVIT. Grady also testified that he did not understand that funds would be removed from the NorthPointe NVIT. Rather, the Nationwide Multi-Managed NVIT was designed as an alternative investment options for VA/VL investing. The creation of the new Nationwide Multi-Managed NVIT did not rise to the level of fraud.

NorthPointe has not demonstrated that Grady, who negotiated the Purchase Agreement, made any false representations in negotiating the agreement, nor that he intended to fraudulently induce NorthPointe into entering into the agreement. Moreover, Hallowell testified that he did not intend to terminate the NorthPointe subadvised agreements at the earliest possible time. Although there may have been other business plans being developed by Nationwide, such as the creation of the Nationwide Multi-Managed NVIT or a move towards a brand-name subadvised funds model, NorthPointe has not presented enough evidence to prove that the behind-the-scenes shifts in management and investment strategy amounted to fraud.

## 2. Breach of Contract and the Implied Covenant of Good Faith and Fair Dealing

Under Delaware law, a breach of contract requires the following elements be met: "(1) a contractual obligation; (2) a breach of that obligation by the defendant; and (3) a resulting damage to the plaintiff."[58] When interpreting a contract, the court uses an objective theory to construe the contract so that it would be understood by an objective, reasonable third party.[59] The contract must be read as a whole and every term and provision of the agreement must be given effect and given its plain and ordinary meaning.[60] The Court must read a contract as a whole and will give each provision and term effect, so as not to render any provision or term "meaningless or illusory."[61] When a contract is ambiguous, or is "reasonably or fairly susceptible [to] different interpretations," the Courts may consider extrinsic evidence outside of the four corners of the contract to interpret the parties' rights and duties under the agreement.[62]

---

[58] *H-M Wexford LLC*, 832 A.2d at 140.

[59] *Osborn ex. rel. Osborn v.* Kemp, 991 A.2d 1153, 1160 (Del. 2010), citing *NBC Universal v. Paxson Commc'ns,* 2005 WL 1038997, at *5 (Del.Ch. Apr. 29, 2005).

[60] *DCV Holdings, Inc. v. ConAgra, Inc.*, 889 A.2d 954, 961 (Del. 2005).

[61] *Osborn ex. rel. Osborn*, 991 A.2d at 1161.

[62] *Cullen v. Dudley*, 2013 WL 422842, at *2 (Del. Super. Jan 29, 2013); *Rhone-Poulenc Basic Chem.Co. v. American Motorists Ins. Co.*, 616 A.2d 1192, 1196 (Del. 1992).

Moreover, the implied covenant of good faith and fair dealing is implicit in every contract.[63]  In reviewing the implied covenant of good faith and fair dealing, the Court is required to "discover additional terms from an agreement; terms in line with the spirit of the agreement but absent from those expressed by the parties."[64]  The implied covenant of good faith and fair dealing requires that a party "refrain from arbitrary or unreasonable conduct which has the effect of preventing the other party to the contract from receiving the fruits of the contract."[65]  A claim for breach of implied covenant of good faith and fair dealing must be specifically referenced to specific terms in the contract.  As such, the Court will find a breach when it is "clear from what was expressly agreed upon that the parties who negotiated the express terms of the contract would have agreed to proscribe the act later complained of as a breach of the implied covenant of good faith–had they thought to negotiate with respect to that matter."[66]

### 3. Nationwide's Termination of NorthPointe Funds and Failure to Pay Termination Fee Under Section 1(a) of Exhibit D

The Court rejects Nationwide's argument that Nationwide's obligations to its shareholders required that Nationwide terminate NorthPointe's role as subadvisor.

---

[63] *Dunlap v. State Farm Fire and Cas. Co.*, 878 A.2d 434, 441-42 (Del. 2005).

[64] *BAE Sys. Info. & Elec. Sys. Integration, Inc. v. Lockheed Martin*, 2009 WL 264088, at *6 (Del. Ch., Feb. 3, 2009).

[65] *PAMI-LEMB I Inc. v. EMB-NHC, L.L.C.*, 857 A.2d 998, 1016 (Del. Ch. 2004).

[66] *Allen v. El Paso Pipeline GP Co., LLC*, 2014 WL 2819005, at *11 (Del. Ch. June 20, 2014).

The record evidence supports a conclusion that Nationwide made a strategic decision to move towards name-brand fund management and NorthPointe, as a boutique investment firm, simply did not fit into this new model. NorthPointe established that Nationwide breached the contract by refusing to pay the termination fees owed under Section 1(a) of Exhibit D. Accordingly, Nationwide is obligated under the terms of the Purchase Agreement to pay a termination fee for the terminated funds under Section 1(a) of Exhibit D.

The Court rejects Nationwide's claim that Nationwide's termination did not trigger the required termination fees under Section 1(a) of Exhibit D. The termination did trigger the required termination fees under Section 1(a) of Exhibit D because (1) Nationwide terminated four subadvised fund agreements; (2) the termination was NOT due to violation of performance standards OR because of Nationwide's responsibilities to its shareholders; and therefore, (3) the termination fees must be paid. Nationwide's failure to pay the termination fees due and owing, was a breach of contract. In addition, Nationwide's disingenuous claim that Nationwide was not obligated to compensate NorthPointe under Section 1(a) of Exhibit D was a breach of the duty of good faith and fair dealing. While Nationwide retained certain flexibility in regard to the subadvisory agreements with the funds, Nationwide's actions had triggered the carefully-negotiated protections for NorthPointe.

**4. Nationwide's Withdrawal of Funds from NorthPointe NVIT Reduced AUM Below Contractual Minimum Set Forth in Exhibit D**

While the Court finds that it was not a breach for Nationwide to establish a competing NVIT fund, the Court does find that Nationwide breached the covenant of good faith and fair dealing by redeeming $260 million from the NorthPointe NVIT and reallocating it to other funds, including $135 million into the competing Nationwide Multi-Managed NVIT. Nationwide's actions violated the contract with respect to the NVIT. First, Nationwide redeemed assets and brought the fund under the critical AUM of $300 million. In addition, it was also a breach of the covenant of good faith and fair dealing to set up the fee structure of the Nationwide Multi-Managed NVIT in such a way that NorthPointe could not possibly compete.

These conclusions are based on the record evidence including evidence that showed that Nationwide made it impossible for NorthPointe to compete with the Nationwide Multi-Managed NVIT because of the lower fee structure put into place by Nationwide. Nationwide's redemption also diminished the effectiveness of the investment power of the NorthPointe NVIT and brought the assets under management below a critical threshold to $174 million.

Moreover, the merger of NorthPointe NVIT into the Multi-Managed NVIT on February 6, 2009 was in direct violation of Section 1(b). According to Hickey, when both NVIT funds, the NorthPointe NVIT and the Nationwide Multi-Managed

48

NVIT, were included on the actively marketed VL/VA menu, it was "critical" to remove the NorthPointe NVIT from the menu because NorthPointe's performance created a "reputational risk" to Nationwide.[67] The Court notes that any concerns about "reputational risk" by Nationwide were not included among the reasons for a Permitted Termination in the Purchase Agreement.

### 5. Nationwide's Termination of NorthPointe-Branded Funds During the 18-month Restricted Period

With respect to the two NorthPointe-branded funds, the Court concludes that Section 5 of Exhibit D is controlling. Nationwide effectively closed these funds to investments in early December 2008 and failed to discuss transfer of sponsorship to NorthPointe.[68] Nationwide breached the contract, specifically its obligations set forth in Section 5 of Exhibit D.

### 6. Nationwide's Failure to Meet Its Marketing Obligations

The Purchase Agreement provided that Nationwide was obligated to market the NorthPointe funds. The Court accepts the testimony of the NorthPointe witnesses that Nationwide's *de minimis* marketing efforts after the MBO paled in comparison to the marketing campaigns Nationwide directed on NorthPointe's

---

[67] Tr. Transcr. Hickey 202:9-15 (Jan. 27, 2014).

[68] Although Nationwide's November 25, 2008 letter stated the funds would be closed no later than April 20, 2009, Nationwide actually stopped accepting deposits in early December 2008.

behalf when Nationwide owned 65% of NP Capital.[69]  Prior to the MBO, several

times per year, the managers of NP Capital traveled throughout the country with

Nationwide personnel meeting with agents and brokers and Registered Investment

Advisors to market the funds advised by NP Capital.  As a result of these

marketing campaigns, assets flowed to NorthPointe Capital.  The Court finds that

Nationwide breached the contract by failing to market the NorthPointe funds as

Nationwide was required to do under the Purchase Agreement.

## 7. Nationwide Did Not Establish Its Counter-Claim or Its Third-Party for Breach of Contract by NorthPointe

The Court finds that Nationwide has not established that it is entitled to

judgment on its claims.  Nationwide's claims fail because Nationwide committed

the first material breach of contract.  Under Section 9.8 of the Purchase Agreement,

Nationwide created an event of default.  Accordingly, RBS issued a lender

blockage letter on March 10, 2009 to notify Nationwide that further payments on

the note were blocked.  Refusing to make further payments was consistent with the

---

[69] For example, Hayden was a credible witness and his testimony regarding the extensive marketing campaigns prior to the MBO was not contradicted.  On the other hand, the Court was unimpressed with the testimony of Dorothy Meyer who testified as a VP of Marketing for Nationwide. Like other Nationwide witnesses, Meyer denied responsibility for any decision-making that was salient to the issues before the court.  Meyer claimed to have no knowledge of the extent of marketing campaigns before the MBO. The Court absolutely rejects as incredible Meyer's claim that Nationwide was reluctant to market the NorthPointe funds because of poor performance.

terms and conditions of the Purchase Agreement. NorthPointe did not breach the contract by refusing to make payments. "[T]he party first guilty of a material breach of contract cannot complain if the other party subsequently refuses to perform."[70]

## VI. DAMAGES

### 1. NorthPointe Suffered Damages as a Result of Nationwide's Breach of Contract

Before the Closing, NP Capital had 20 employees. Once the MBO took place, it was necessary for NorthPointe to assume responsibility for the functions previously handled by Nationwide. For example, Terry Gardner, who joined NorthPointe as a consultant in May 2007 became NorthPointe's Chief Operating Officer in 2008. After Closing, NorthPointe had 31 employees. At the time of the trial, NorthPointe had only 15 employees.[71]

As of July 19, 2007, NorthPointe derived its revenue from its management of approximately \$3.5 billion in AUM. Approximately \$2.7 billion of NorthPointe's AUM came from 74 institutional accounts held by pension funds and large-scale institutional investors. During this time, after the Purchase Agreement

---

[70] *Hudson v. D & V Mason Contractors, Inc.*, 252 A.2d 166, 170 (Del. Super. 1969).

[71] The Court acknowledges the significant reduction in market valuation across all asset classes in October 2008. Nevertheless, the Court specifically finds, as discussed herein, that Nationwide's actions caused the damage to NorthPointe noted here. No evidence was presented at trial by which the Court could attribute any damages to the market crash rather than to Nationwide's breaches of the contract and its duty of good faith and fair dealing.

was signed, NorthPointe's remaining AUM, approximately $784 million, came from Nationwide-sponsored funds managed by NorthPointe.

Nationwide's actions directly impacted NorthPointe's business opportunities with respect to other investors. Indeed, Nationwide's actions directly blocked some of those investors from making required deposits into the two NorthPointe-branded funds. In addition to the direct blocking of deposits, Nationwide's actions had an indirect impact on NorthPointe. NorthPointe lost the marketplace cache of its affiliation with Nationwide. Also, the relative cost for these other investors increased significantly. The termination on NorthPointe as subadvisor also created catastrophic business repercussions for NorthPointe. For example, NorthPointe lost the State of Arizona as an institutional client.

Mary Beth Grabel testified as a witness at trial. In 2007, Grabel became a partner of NorthPointe when the MBO took place. Grabel was the Chief Compliance Officer for NorthPointe from 2000 through 2013. At the time of her trial testimony, Grabel was no longer employed by NorthPointe. Grabel's testimony provided the Court with a perspective of the impact of Nationwide's breach of contract and breach of the covenant of good faith and fair dealing. Grabel testified that Nationwide's actions were personally and professionally devastating.

Several other NorthPointe witnesses also testified about the impact of Nationwide's actions on NorthPointe. After NorthPointe received the November 25, 2008 termination letter, NorthPointe employees were fired in several waves.[72] Salaries were cut substantially.[73] No one received a bonus. According to Gardner, the pay cuts put in place in 2008 have remained in place. According to Gardner, NorthPointe paid a heavy price but the biggest concern was to stay in business and maintain a good relationship with RBS, with whom NorthPointe obtained financing for the MBO.

NorthPointe did not seek to initiate a hostile relationship with Nationwide by accusing Nationwide of breach of contract. Instead, efforts were made by NorthPointe to try to find whether there was any common ground, whether there had been a misunderstanding, and whether the business relationship could be salvaged. Hayden and Gardner reached out to Hallowell to ask if there was a way to replace the lost revenue flows and NorthPointe attempted multiple times to have meetings with Nationwide to repair the relationship.[74]

---

[72] Gardner emphasized that the November 25, 2008 termination letter was received at the start of the winter holiday season. This timing had an especially significant impact on NorthPointe's family-oriented workplace.

[73] Gardner noted that the lowest paid clerical staff did not suffer pay cuts.

[74] For example, after NorthPointe received the November 25, 2008 letter, Hayden called Hickey at Nationwide. Hayden testified that Hickey told Hayden that Nationwide would build the fund back up.

## 2. Section 1(a) was Not Meant as a Cap on Damages

The termination of four retail funds by Nationwide triggered Nationwide's duty to pay up to $3.5 million in termination fees because NorthPointe did not fall below the performance standards established by the Purchase Agreement. The Court rejects Nationwide's contention that $3.5 million set forth in Section 1(a) is a cap on total damages. The record evidence does not support a finding that the parties intended a cap. For example, Grady authored an e-mail message on July 3, 2007[75] that specifically referenced Section 1(b) of Exhibit D. According to Grady, who was involved on behalf of Nationwide in drafting Exhibit D, this document does not address damages for breach of contract. Rather, Section 1(a) of Exhibit D provides for termination fees if certain funds are terminated by Nationwide.

The record evidence supports a finding that the fees up to $3.5 million were a penalty to be paid for non-Permitted Termination, and would be calculated based on the income that would be generated by the four retail funds over a three-year period. Those funds are the Nationwide Mid Cap Growth Fund, the Nationwide Value Opportunities Fund, the Nationwide Large Cap Value Fund and the Nationwide Microcap Equity Fund.[76]

---

[75] Tr. Ex. 85

[76] Schedule 1 to Exhibit D, Purchase Agreement, Tr. Ex. 88.

Specifically, the penalty was calculated on the projection that the 4 retail funds, the Nationwide Mid Cap Growth Fund, the Nationwide Value Opportunities Fund, the Nationwide Large Cap Value Fund, and the Nationwide Microcap Equity Fund, would generate $3.5 million in revenue for NorthPointe over the three-year period after the Closing. It was expected that the two small cap funds, the NorthPointe Small Cap Value Fund and the NorthPointe Small Cap Growth Fund, would generate more than $1 million in revenue for NorthPointe over the three-year period after the Closing. According to Gardner, the funds terminated by the letter dated November 25, 2008, were earning between $400,000 and $500,000 per month. This represents revenue of $4-5 million per year.

The Court concludes that the terminations by Nationwide of the four retail funds were not Permitted Terminations because these funds were meeting the performance standards. Indeed, in the letter dated November 25, 2008, Nationwide acknowledged that Section 1(a) of Exhibit D obligated Nationwide not to terminate these funds until September 30, 2012 without the payment of a fee. Once Nationwide made the business decision to terminate these funds, it then owed the penalty set forth in Section 1(a).

55

### 3. Section 1(b) Applies to the NorthPointe NVIT and Damages Are Owed Accordingly

The withdrawal of $260 million from the NorthPointe NVIT and subsequent merger of this fund triggered Nationwide's duty to compensate NorthPointe under Section 1(b). Based on the record evidence and the findings of fact, the Court concludes that Section 1(b) of Exhibit D applies to the NorthPointe NVIT.

Unlike Section 1(a), Section 1(b) does not set forth a specific calculation for a penalty. Rather, that penalty is calculated separately. It was expected that the NorthPointe NVIT would generate $3.9 million in revenue for NorthPointe over the three-year period after the Closing. This was the most important provision for the NorthPointe NVIT in that it provides additional protection that is not otherwise available to NorthPointe under Section 1(a) and, according to Grady, was meant to address the very specific concerns expressed by NorthPointe about the NorthPointe NVIT's future.

### 4. Damages Calculation

The Court accepts the testimony and opinion of Lawrence A. Simon, NorthPointe's expert witness.[77] The Court finds that Nationwide expressly

---

[77] David Marcus testified as an expert witness on behalf of Nationwide. Marcus stated that he was retained to analyze and respond to Simon's report. Marcus testified that Simon's valuation analysis is flawed and, as a result, the damages are overstated. Marcus identified three flaws: (1) Simon arbitrarily increased the discount rate; (2) Simon arbitrarily reduced the income for other funds in the "spillover analysis;" and (3) Simon used an improper treatment for the NorthPointe's

breached the contract with NorthPointe and breached the implied covenant of good faith and fair dealing. Accordingly, the Court will apply Simon's express breach of contract damage scenario number 1 to the total amount of damages, as this is the higher of the two contract breach calculations. [78]

The Court accepts Simon's analysis regarding the recalculation of the purchase price based on the express breach of contract. Simon properly utilized the Merrill Lynch valuation to recalculate the overpayment of $13,472,528. The total amount reflects the recovery of purchase price, excluding the NorthPointe NVIT.

The Court finds that Nationwide is entitled to termination fees under Section 1(a) of Exhibit D and accepts Simon's calculation of $605,785. This calculation includes a termination fee calculated for the Nationwide MicroCap Equity Fund,

---

cost structure which does not account for fixed costs. For several reasons, the Court finds Marcus' analysis to be suspect. First, he was disingenuous when he claimed he did not know how much his employer was paid for his expert opinion and testimony. Second, he offered an expert opinion on valuation without speaking with anyone at Merrill Lynch on whose valuation the purchase price was negotiated. Third, he never had a conversation with anyone at Nationwide to discuss the controlling documents. Finally, Marcus testified that the value of the company may be different than the purchase price. On balance, Marcus' presentation was far too academic to be of any assistance to the Court in addressing the issues in dispute.

[78] Simon presented three alternate scenarios for a damages calculation. Under Simon's scenario number 1, Nationwide owes NorthPointe $15,738,243 in express contract damages. Under Simon's scenario number 2, Nationwide owes NorthPointe $15,132,458 in implied contract damages. Under Simon's scenario number 3, Nationwide owes NorthPointe $16,918,593 damages for fraud/misrepresentation.

the Nationwide Mid Cap Growth Fund, the NorthPointe Small Cap Value Fund, and the NorthPointe Small Cap Growth Fund, less any actual fees received through April 30, 2009. The record evidence supports this finding.

The Court accepts Simon's analysis that the revised note amount is $4,831,370. The note amount is adjusted in proportion with the $16 million cash payment and the $9 million note in the Purchase Agreement. The adjusted amount reflects NorthPointe's remaining obligations to Nationwide under the note.

Simon's calculations include compensation to NorthPointe for $1,659,930 in the direct costs associated with NorthPointe's expansion of its business and services to assume the back-office responsibilities previously handled by Nationwide for NorthPointe Capital. The Court finds that NorthPointe is entitled to receive the first three categories of direct costs identified by Simon: (i) $286,429 for Forbearance Fees and related costs; (ii) $125,000 for Compensation Agreement; (iii) $134,139 in Legal and Advisory Fees; (iv) $884,862 in recovery of costs related to office expansion; and (v) $562,500 in recovery of principal payments to Nationwide. However, the Court finds that NorthPointe did not establish by a preponderance of the evidence that NorthPointe was entitled to the $551,862 for the property lease and office expansion costs. Accordingly, the direct costs due and owing as damages are $1,659,930 less $551,862.

## VII. CONCLUSION

1. NorthPointe has not proven by a preponderance of the evidence its claim for fraud;

2. NorthPointe has proven by a preponderance of the evidence its claim for breach of contract, including the breach of the covenant of good faith and fair dealing, and is owed $15,186,381.00[79] in damages and termination fees (this amount must be set-off by the revised note amount);

3. NorthPointe has established by a preponderance of the evidence that the revised note amount is $4,831,370;

4. Nationwide has not established by a preponderance of the evidence that it is entitled to judgment for its breach of contract claim against NorthPointe; and

5. The note owed by NorthPointe to Nationwide is satisfied by the damages owed to NorthPointe by Nationwide.

---

[79] This damage calculation reflects the total amount of damages of $15,738,243 calculated by Simon in his express breach of contract scenario less $551,862 for the property lease, which the Court finds that NorthPointe did not prove by a preponderance of the evidence.

NOW, THEREFORE, JUDGMENT SHALL ENTER in favor of NorthPointe Holdings, LLC, NorthPointe Capital, LLC, Peter Cahill, Mary Champagne, Robert Glise, Michael Hayden, Jeffrey Petherick, Stephen Roberts and Carl Wilk and against Nationwide Emerging Managers, LLC and Nationwide Corporation and Nationwide Mutual Insurance Company in the amount of $10,355,011.00 ($15,186,381.00 less the revised note amount of $4,831,370.00). Each party shall bear its own costs, fees, and expenses (other than the fees and costs set forth in the award to NorthPointe in the Court's damages calculation).

IT IS SO ORDERED this 16th day of July 2014.

*Andrea L. Rocanelli*

_____

Hon. Andrea L. Rocanelli